# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MYRNA L. GONZALEZ, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 06-76-LPS |
| | : | |
| MICHAEL J. ASTRUE,[1] | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

John S. Grady, GRADY & HAMPTON, Dover, Delaware, Attorney for Plaintiff.


Colm F. Connolly, United States Attorney, and David F. Chermol, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware; Michael McGaughran, Regional Chief Counsel, SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania, Attorneys for Defendant.


### MEMORANDUM OPINION


February 28, 2008
Wilmington, Delaware

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Accordingly, pursuant to Fed. R. Civ. P. 25(d)(1), Michael J. Astrue is substituted for the former Commissioner Jo Anne B. Barnhart.

STARK, U.S. Magistrate Judge

## I. INTRODUCTION

Plaintiff Myrna L. Gonzalez ("Gonzalez") appeals from a decision of Defendant Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-33. The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Gonzalez and the Commissioner. (D.I. 17, 19) Gonzalez's motion for summary judgment asks the Court to award her DIB. (D.I. 17) The Commissioner's cross-motion for summary judgment requests that the Court affirm his decision and enter judgment in his favor. (D.I. 19) For the reasons set forth below, Gonzalez's motion for summary judgment will be granted in part and denied in part, and the Commissioner's cross-motion for summary judgment will be denied. This matter will be remanded for further proceedings.

## II. BACKGROUND

### A.   Procedural History

Gonzalez filed the application for DIB at issue in this case on September 11, 2002. *See* Transcript (hereinafter "Tr.") at 20, 116. That application was denied initially on December 23, 2002 and again denied on reconsideration on October 14, 2003. Tr. at 77-81, 83-87. After a requested hearing, an administrative law judge (ALJ) issued a decision on November 24, 2004 denying benefits. Tr. at 17-30, 90. On June 10, 2005, the Appeals Council denied Gonzalez's request for review. Tr. at 10-13. On December 20, 2005, the Appeals Council set aside its earlier action and considered additional information that had been supplied. Tr. at 5-9. On that

1

earlier action and considered additional information that had been supplied. Tr. at 5-9. On that same date, however, the Appeals Council denied the request for review. Tr. at 5. Thus, the ALJ's November 24, 2004 adverse decision became the final decision of the Commissioner. *See id.*; *see also* 20 C.F.R. §§ 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On February 3, 2006, Gonzalez filed a Complaint seeking judicial review of the ALJ's November 24, 2004 decision. (D.I. 2) On November 8, 2006, Gonzalez moved for summary judgment. (D.I. 17) The Commissioner filed a cross-motion for summary judgment on December 4, 2006. (D.I. 19) Thereafter, on January 9, 2008, the parties consented to the jurisdiction of a United States Magistrate Judge. (D.I. 30)

**B.     Factual Background**

**1.     Gonzalez's Medical History, Treatment, And Condition**

At the time she filed the relevant DIB application in September 2002, Gonzalez was 39 years old. Tr. at 21, 116. She has a high school education and earned a diploma upon completion of a vocational program to become a public school assistant teacher. Tr. at 126. She has worked as a child care worker, assembly line packer, and food inspector. Tr. at 67, 121, 129-34.

Gonzalez claims to have been disabled since April 12, 2001[2] due to several physical problems, including muscle spasms in the cervical and lumbar spine, myofascial[3] pain, and loss of vision. Tr. at 21, 120, 149.

### a.  Gonzalez's Visual History And Treatment

Gonzalez's opthamologist, Rodolfo J. Rios, summarized Gonzalez's treatment for vision difficulties attributable to diabetes in a December 17, 2001 letter. Tr. at 182. At that time, Dr. Rios reported that Gonzalez's best corrected visual acuity was 20/50 in the right eye and 20/60 in the left eye, and that she also had astigmatism and presbyopia. *Id.* During that period, Gonzalez had normal intraocular pressure, confrontation fields, and color perception. *Id.* Also at that time, however, Dr. Rios diagnosed Gonzalez with bilateral proliferative diabetic retinopathy. *Id.* To combat the resulting vitreous hemorrhages in both of Gonzalez's eyes, Dr. Rios responded with laser treatment, and also performed panretinal photocoagulation in Gonzalez's right eye. *Id.*

In a September 30, 2003 letter relating to Gonzalez's claimed disability, Dr. Rios stated that he had followed Gonzalez for proliferative diabetic retinopathy, ocular pain, and as a glaucoma suspect. Tr. at 263. He reported that Gonzalez underwent several laser treatments and that her retinopathy was presently stabilized. *Id.* Dr. Rios further stated that Gonzalez's current

---

[2]The relevant time period in this case began on April 12, 2001, the date Gonzalez allegedly became disabled. Tr. at 107, 116. The last day upon which Gonzalez was insured for purposes of DIB was December 31, 2004. Tr. at 6, 116. Accordingly, to receive DIB, Gonzalez has to prove she was disabled as of some date between April 12, 2001 and December 31, 2004. *See* 42 U.S.C. § 423(a)(1)(A) & (c)(1)(B); 20 C.F.R. §§ 404.101(a), 404.131(a).

[3]The term "myofascial" means "'of or relating to the fascia surrounding and separating muscle tissue.' Stedman's Medical Dictionary 1168 (26th ed. 1995). 'Fascia' is a 'sheet of fibrous tissue that envelops the body beneath the skin; it also encloses muscles and groups of muscles, and separates their several layers or groups.' Id. at 628." *Gowell v. Apfel*, 242 F.3d 793, 795 n.3 (8th Cir. 2001).

visual acuity in both eyes was 20/40. *Id.* Her intraocular pressures, however, were not under control at that time. *Id.* While Dr. Rios stated that "[v]isually wise, despite her functional limitations, the patient is able to sit, stand, walk and handle objects," he was also aware that she had "joint problems;" he therefore could "not say if those problems could limit her work related physical activities." *Id.* He cautioned that "her visual prognosis is reserved and everything will depend on the progression of the diabetic retinopathy." *Id.* Dr. Rios further concluded that Gonzalez "is partially visually disabled." *Id.*

### b. History And Treatment Of Gonzalez's Myofascial Pain And Other Conditions

On February 19, 2001, Gonzalez sought treatment from Dr. Hector Maya, a general practitioner, for right shoulder pain due to "heavy working." Tr. at 238. Upon examination, Dr. Maya observed tenderness and limited range of motion in Gonzalez's right shoulder. *Id.* He diagnosed right shoulder pain and prescribed medication. *Id.* A few weeks later, after Gonzalez continued to complain of right shoulder pain, Dr. Maya referred Gonzalez to Dr. Wilson Choy, an orthopedic surgeon, for consultation. Tr. at 237.

On May 10, 2001, Gonzalez visited Dr. Choy, reporting that her "severe" right shoulder pain and muscle spasms began two months earlier when she lifted some furniture at work. Tr. at 217. Dr. Choy noted that although an April 2001 x-ray of the right shoulder "demonstrate[d] no pathology" and found only mild degenerative changes, upon physical examination Dr. Choy observed that Gonzalez had "severe muscle spasm to the trapezoid muscles and to the rhomboid muscles." Tr. at 184, 217. He said that the spasms "elevate[d] her right scapula and cause[d] occasional right shoulder pain." Tr. at 217. He further noted that she had "limitation of ROM

4

[range of motion] due to pain around the parascapular region," "lumbosacral tenderness," "poor mobility due to the muscle spasm to her right shoulder girth," and "global decreased sensation to her hands." *Id.* Dr. Choy diagnosed Gonzalez with "right shoulder paramuscle spasms, possible nerve root impingement." *Id.* Dr. Choy thereafter recommended physical therapy and prescribed several medications. *Id.*

In accordance with Dr. Choy's recommendation, on May 14, 2001 Gonzalez consulted physical therapist Jill Elliott. Tr. at 173-74. Having experienced little relief, on May 16, 2001 Gonzalez received a cortisone treatment from Dr. Choy, a response to the "pain to her trapezial muscle and moderate spasm" and "pain in the subacromial region." Tr. at 217. On examination in late May 2001, Dr. Choy found Gonzalez continued to have "exquisite pain" to her right paracervical muscles and to her right trapezial muscles, though she also had an improved range of motion in the right shoulder. Tr. at 216. Dr. Choy refilled Gonzalez's medications. Tr. at 217.

In June 2001, Gonzalez visited the emergency room on two occasions complaining of neck and right shoulder pain. Tr. at 176-81. During one visit, Gonzalez attributed her pain to an April 2001 fall at work. Tr. at 176. The attending physicians diagnosed Gonzalez with acute neck pain and spasms as well as acute low back pain and spasms. Tr. at 178, 181. Observing tenderness, muscle spasms, and decreased range of motion in the cervical and lumbar spine, the attending physicians prescribed medication. *Id.*

Gonzalez returned to Dr. Choy in August 2001 with complaints of pain in her neck and right upper arm. Tr. at 216. While Gonzalez had followed the suggested regime of physical therapy, it had provided her no relief. *Id.* Dr. Choy observed tenderness and swelling throughout

5

the right arm. *Id.* His impressions were "right upper arm pain and diffuse myalgia pain of her body, cause unknown." *Id.* Dr. Choy noted that the June 2001 MRIs of Gonzalez's right shoulder and cervical spine were within normal limits, but referred her for a rheumatological work-up as to possible underlying diseases. Tr. at 216, 218.

Sometime between approximately September or October 2001 and January 2002, Gonzalez became a patient of Dr. Jose Antonio Pando, who was board-certified in rheumatology and internal medicine. On January 23, 2002, Dr. Pando examined Gonzalez and observed severe pain in her right shoulder. Tr. at 232. He diagnosed her as having right shoulder pain and severe myofascial pain, noting that with severe myofascial pain syndrome Gonzalez had "diffuse pain and moderate to severe decrease in the range of motion that is very dramatic." Tr. at 231-32. In his report of January 28, 2002, Dr. Pando remarked that, despite aggressive treatment for a few months, he had not succeeded in treating Gonzalez's symptoms. Tr. at 231. He prescribed a narcotic analgesic and recommended physical therapy. Tr. at 231-32.

On January 29, 2002, Gonzalez returned to physical therapy and continued with it through May 21, 2002. The therapy proved ineffective. Tr. at 188-214. When she first started physical therapy, Gonzalez reported that her areas of concern were her shoulder and neck, which were aggravated by lifting and sitting. Tr. at 208. The final physical therapy reports state that she "continue[d] to report . . . shoulder and neck pain." Tr. at 189.

Between March and August 2002, Gonzalez visited Dr. Pando on a monthly basis with complaints of pain in her right shoulder, right arm, and back. Tr. at 220-32. Physical examinations found tenderness, muscle spasms, and decreased range of motion in the cervical and lumbar spine. Tr. at 220, 222-25, 227, 229-30. Dr. Pando continued to treat Gonzalez's

6

symptoms conservatively with medication. Tr. at 220-30. In March, he noted that her discomfort was progressively worsening and Gonzalez was experiencing "more significant difficulty with movement . . . and has dramatic pain that has not responded to current interventions." Tr. at 228. He further noted that medication had failed to address her discomfort. *Id.* His April 8, 2002 report stated that Gonzalez had new pain in the contralateral side. Tr. at 226. He was "concerned that she is developing generalized fibromyalgia[4] and the severity of her symptoms will mean that she will not be able to be gainfully employed performing the type of occupation she has held in the past." *Id.* Dr. Pando added, "I do not know whether she will be able to perform any other occupation. This problem seems to be working rapidly and therefore I think it would be unfair to the patient to make comments regarding long-term predictions of her conditions." *Id.* Despite a normal x-ray of the right shoulder on April 22, 2002, Tr. at 241, in his report of August 29, 2002 Dr. Pando further remarked that Gonzalez's:

> myofascial pain . . . has been progressively getting worse. Her muscle spasms and discomfort in the right shoulder seems to be worsening progressively. She now has muscle spasms around the cervical spine and around the lumbosacral spine. Secondary to dramatic discomfort and the fact that she is increasingly getting worse despite our best efforts, I think she may be permanently disabled.

Tr. at 221.

On November 7, 2002, Disability Determination Services (DDS) sent Dr. Maya a letter requesting medical evidence of Gonzalez's purported disability. Dr. Maya responded with the

---

[4]The term "fibromyalgia" means "pain in fibrous tissues, muscles, tendons, ligaments, and other areas. This diagnosis is made on the basis of an individual's subjective symptoms after testing has excluded underlying systemic or autoimmune disorders. Fibromyalgia may disappear spontaneously but can become recurrent or chronic." *Jopson v. Astrue*, 517 F.Supp.2d 689, 692 n.7 (D. Del. 2007).

relevant progress notes and medical records from February 2001 through November 2002. Tr. at 233-41. These included Dr. Maya's June 3, 2002 records stating that Gonzalez was tender in the right arm and shoulder areas and noting "fibromyalgia." Tr. at 236. Dr. Maya appears to have continued Gonzalez on medication and physical therapy. Tr. at 236-38. Dr. Maya advised DDS he was willing to perform additional tests or examinations on Gonzalez if further medical evidence was needed. Tr. at 234.

In December 2002, DDS sent Dr. Choy a letter requesting information about Gonzalez. Dr. Choy responded by attaching and forwarding medical records from May 2001 to August 2002. Tr. at 215-19. In responding to a similar form from DDS in September 2003, Dr. Choy stated he had no new medical information to report. Tr. at 252.

On December 20, 2002, Anne Aldridge, M.D., a non-examining state agency physician (specialty unspecified), filled out a physical residual functional capacity assessment ("PRFCA") based upon an examination of Gonzalez's file. Tr. at 242-51. Dr. Aldridge concluded that, despite the diagnosis of myofascial pain and other physical impairments, Gonzalez could perform a range of light work. *Id.* Among other things, with respect to exertional limitations, Dr. Aldridge indicated Gonzalez could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. Tr. at 243. She also indicated Gonzalez retained the ability to push and/or pull, and that Gonzalez had no postural limitations, except that she could never climb a ladder, rope, or scaffolds. Tr. at 243-44. No manipulative, visual, or communicative limitations were indicated (except that Gonzalez was not to engage in repetitive overhead use of her bilateral upper extremities). Tr. at 245. The only environmental

8

limitations Dr. Aldridge noted were that Gonzalez should avoid concentrated exposure to extreme heat and cold, wetness, and vibration. Tr. at 246. While she acknowledged that Gonzalez's symptoms were attributable to a medically determinable impairment, Dr. Aldridge did not believe that the severity of Gonzalez's symptoms and their alleged effect on Gonzalez's functioning were wholly consistent with the "total medical and non-medical evidence, including statements by [Gonzalez] and others, observations regarding activities of daily living, and alterations of usual behavior or habits." Tr. at 247. In reaching her conclusions, however, Dr. Aldridge stated that she had not reviewed any statements from Gonzalez's treating physicians and, therefore, had not reached any conclusion about the opinions of those treating physicians with respect to Gonzalez's physical capacities. Tr. at 248.

In April 2003, Gonzalez reported to Dr. Pando that she was experiencing right shoulder pain, stiff fingers, and foot cramps. Tr. at 261. Observing muscle spasms in her right shoulder, Dr. Pando refilled Gonzalez's medications. *Id.* Gonzalez visited Dr. Pando on three more occasions between May and August 2003 with complaints of right shoulder and other pain. Tr. at 256-60. The results of Gonzalez's physical examinations were essentially unchanged, so Dr. Pando continued to treat the symptoms conservatively with medication. Tr. at 256, 258, 260. In a May 23, 2003 report, Dr. Pando wrote that in the time since she had become his patient, Gonzalez could not have been gainfully employed. Tr. at 259. Gonzalez had experienced "an increasing amount of tenderness and discomfort in the right shoulder and hemithorax. She has been diagnosed as having severe myofascial pain that has been progressively worsening. The degree of symptoms the patient is experiencing, at this time, is severe." *Id.* Dr. Pando opined that he was "very concerned about the degree of symptoms and pain that she is experiencing" and

9

while he had "tried different interventions . . . [they] have not been helpful in controlling her symptoms, so far." *Id.*

On September 10, 2003, DDS sent Dr. Pando a letter requesting medical evidence of Gonzalez's purported disability. Dr. Pando responded by forwarding relevant treatment notes and medical reports from Gonzalez's 2003 visits. Tr. at 253-62.

On October 9, 2003, Vinod Kataria, M.D., a second non-examining state agency physician (specialty unspecified), reviewed the documentary evidence on file and agreed with Dr. Aldridge that Gonzalez could perform a range of light work. Tr. at 267-76. Dr. Kataria filled out a PRFCA and concluded that Gonzalez could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. Tr. at 268. He also indicated Gonzalez retained the ability to push and/or pull, and had no postural limitations except that she could only occasionally climb a ladder, rope, or scaffolds, and could only occasionally stoop, kneel, crouch, and crawl. Tr. at 268-69. No manipulative, visual or communicative limitations were indicated (except that she was subject to limited overhead reaching with her right shoulder). Tr. at 270. The only environmental limitations Dr. Kataria indicated were that Gonzalez should avoid concentrated exposure to vibration and machinery. Tr. at 271. While he acknowledged that Gonzalez's symptoms were attributable to a medically determinable impairment, Dr. Kataria had no remarks as to whether the severity or duration of Gonzalez's symptoms were disproportionate to the expected severity or duration on the basis of those impairments. Tr. at 272. He also did not believe that the severity of Gonzalez's symptoms and their alleged effect on Gonzalez's functioning were consistent with the "total medical and

10

non-medical evidence, including statements by [Gonzalez] and others, observations regarding activities of daily living, and alterations of usual behavior or habits." *Id.* Notably, like Dr. Aldridge, Dr. Kataria stated that he had no statements from Gonzalez's treating or examining physicians to examine. Tr. at 273.

On May 10, 2004, Gonzalez saw Dr. Mir Mousavi, a board certified oncologist. Tr. at 310. Dr. Mousavi noted that Gonzalez had diabetes mellitus and that the etiology of normocytic anemia was not clear. *Id.* On his October 26, 2004 report, Dr. Mousavi noted that Gonzalez continued to complain of shoulder pain and, therefore, he referred her back to Dr. Maya's care. Tr. at 300.

On June 17, 2004, Dr. Pando wrote a report to Dr. Jona Gorra, who had become Gonzalez's primary care physician and family doctor. Dr. Pando explained that Gonzalez presented a "complex case of diabetes mellitus with myofascial pain syndrome that is developing into fibromyalgia and chronic pain syndrome diffusely." Tr. at 302.

Gonzalez visited Dr. Gorra on several occasions between June and November 2004. At one visit, Gonzalez reported leg pain as a result of an accident with a shopping cart. Tr. at 288. At another visit, Gonzalez stated that she injured herself from falling down in a store. Tr. at 292, 294. A September 20, 2004 x-ray of her left lower leg showed no evidence of fracture but reflected mild degenerative changes and calcific tendinitis or bursitis. Tr. at 283, 297-98. A September 23, 2004 x-ray of the lumbar spine showed "no significant abnormality." Tr. at 282, 296. Physical examinations by Dr. Gorra generally showed tenderness and decreased range of motion in the right shoulder and back. Tr. at 291-92, 294-95. Dr. Gorra's main diagnoses were right shoulder pain, low back pain, and myofascial pain. *Id.*

11

On October 7, 2004, Dr. Gorra referred Gonzalez to Dr. Harry Freedman, an orthopedic specialist. Tr. at 281, 301. Dr. Freedman observed that while Gonzalez had normal strength and reflexes, she also had right arm pain with rotation of her neck. *Id.* While Dr. Freedman noted that x-rays of the cervical and lumbar spine were normal, he diagnosed Gonzalez with posttraumatic cervical and lumbar radiculopathy in the right arm and left leg; he prescribed medication and recommended physical therapy. *Id.*

In an October 12, 2004 letter, Dr. Pando remarked that Gonzalez was disabled due to her myofascial pain. Tr. at 312. Specifically, he stated that she has a "very severe myofascial involvement of the right shoulder that began with a sprain and, subsequently, has evolved into a very painful condition that limits, dramatically, the range of motion and requires very strong analgesic medication to control." *Id.* He also "noticed that [Gonzalez] has had dramatic pain and muscle spasms throughout the last visits, as you can attest in my medical notes and I don't think that, at this point, she can be gainfully employed because very minimal motion causes dramatic increase in pain and tenderness." *Id.* While Dr. Pando had attempted different alternative treatments, they had failed to relieve Gonzalez's symptoms. *Id.*

On November 11, 2004, Dr. Gorra completed a "Physical Residual Functional Capacity Questionnaire" based on his history of treating and examining Gonzalez. Tr. at 277-311. His form contained several handwritten notes and attachments consisting of approximately thirty pages. *Id.* Dr. Gorra stated that he had seen Gonzalez every two to four weeks since June 3, 2004. Tr. at 277. He noted that she suffered from right shoulder pain, back pain, and leg pain as well as myofascial pain. Tr. at 277, 287. He identified the clinical findings and objective signs as tenderness in the right shoulder, abduction of 90% in the right shoulder, and spasm of the

12

muscles. Tr. at 277. Dr. Gorra described Gonzalez's shoulder pain as sharp and radiating to the chest, neck, and back, and further as increasing from movement and any activity. Tr. at 291. He added that Gonzalez was not a "malingerer" and her impairments were reasonably consistent with the symptoms and functional limitations he described in his evaluation. Tr. at 277-78. In Dr. Gorra's view, Gonzalez's pain and other symptoms were severe enough to interfere constantly with her attention and concentration, rendering her incapable of even low-stress jobs. Tr. at 278. Gonzalez could "hardly undress herself because of the pain." *Id.*

Dr. Gorra also identified various functional limitations that would hinder Gonzalez in a competitive work setting. She would be able to walk only two to three city blocks. *Id.* She could frequently lift 10 pounds or less and could never lift 20 pounds. Tr. at 279. She had significant limitations in doing repetitive reaching, handling, or fingering; had no use of her right hand or arm; and enjoyed only 80% use of her left hand or arm. *Id.* Dr. Gorra further stated that Gonzalez could continuously sit or stand for no more than 15 minutes at a time and could do each for no more than two hours per workday. Tr. at 278. He added that Gonzalez would need a break every 15 minutes during a workday. Tr. at 278-79. Gonzalez could never crouch, had very limited stooping ability, and might experience increased pain with extreme temperature and weather changes. Tr. at 279-80. Finally, Dr. Gorra estimated that Gonzalez would miss more than four days of work per month due to her impairments. *Id.*

Although the relevant time period ends on December 31, 2004, the Appeals Council agreed to include certain materials subsequent to this date in the record as relating to the relevant time period. Tr. at 9, 13, 318. First received and included was a March 4, 2005 letter from Dr. Pando to Dr. Gorra stating that Gonzalez had "significant problems in the shoulder and neck.

13

Severe muscle spasms are noticed." Tr. at 320.  In that letter, Dr. Pando recommended that

Gonzalez not return to work, adding that he believed she was "having problems secondary to the

fibromyalgia and neuropathy and osteoarthritis." *Id.*  Also included was a May 3, 2005 letter

from Dr. Gorra explaining that Gonzalez would not return to work until further notice.  Tr. at

322.[5]

### 2.     The Administrative Hearing

At Gonzalez's administrative hearing, held on November 4, 2004, the ALJ heard testimony

from Gonzalez and from Bruce Martin, an impartial vocational expert.  Tr. at 31-74.

### a.     Gonzalez's Testimony

Gonzalez testified that during the relevant period, she had several physical problems and

experienced extreme pain that severely limited her daily functioning.  Specifically, Gonzalez

testified that she was not able to drive because she could not pass the driving test.  Tr. at 37.  She

has difficulty reading English and "can't understand" English.  *Id.*  She had stopped working as a

public school assistant teacher after injuring her shoulder, neck, arms, back, and leg carrying

heavy objects at the school.  Tr. at 39.

Gonzalez further testified that she currently experiences sharp pain on a daily basis in her

shoulder, fingers, legs, knees, and back.  Tr. at 44, 55.  The pain subsides for 20 minutes after she

takes her medication but then returns.  Tr. at 55.  Since her April 2001 accident, Gonzalez said

she gets "too much pain[] in my arms and my finger, all my arms in the morning is numb."  Tr. at

44.  She reported that she has "sharp pains" in her back and neck and her shoulder has been

---

[5]Also reviewed by the Appeals Council but not incorporated into the record (because such
information concerned a time after December 31, 2004) was correspondence dated September 13,
2005 from Dr. Rios and correspondence dated September 30, 2005 from Dr. Pando.  Tr. at 6.

swollen. *Id.* Her leg felt like it was burning and she has "sharp pain from the left sides of [her] knees." *Id.* She takes medications for diabetes, pain, and to help her sleep, but the medications cause her "too much drowsing." Tr. at 45-46. Yet she cannot sleep well at night and wakes up about 4:00 a.m. with pain. Tr. at 56.

Gonzalez estimated that she could perhaps walk 15 or 20 minutes and could stand for 20 to 25 minutes, but could not do too much bending or any kneeling, stooping, or crouching. Tr. at 48-49. She could sit for perhaps 25 minutes before the pain would become too unbearable to continue. Tr. at 49. She cannot reach one gallon of milk and experiences significant shoulder pain if she attempts to do so. Tr. at 50. When she takes a shower she cannot wash her back with her hands. Tr. at 51.

With respect to her vision, Gonzalez testified that she has diabetic retinopathy in her eyes, for which she is receiving treatment, and glaucoma. Tr. at 47, 49, 51. She has pain in her eyes and often experiences headaches, requiring her to use eye drops. Tr. at 52. She had laser surgery "about five times in both eyes." Tr. at 47.

The maximum she reported being able to lift is perhaps 10 to 15 pounds on the right side and perhaps 20 pounds on the left side. Tr. at 53. At the grocery store her sister-in-law has to push the cart. Tr. at 54. Gonzalez is unable to do any housework (except helping with dishes) and relies on her sister-in-law to cook. Tr. at 56-57.

Gonzalez said she watches television sometimes, goes outside briefly if it is not too cold, watches her fish, and does not "do too much in the day." Tr. at 57. She has someone help her get dressed. Tr. at 59. She has to drink 11 medications daily and they cause dizziness. Tr. at 60. She liked her job and enjoyed working with children and would prefer to do that rather than be

on Social Security, but she feels she could not do her regular job because of her pain.  Tr. at 60,

63.[6]

### b.    The Vocational Expert's Testimony

At the hearing, Mr. Martin, the vocational expert, was asked by the ALJ to:

> [A]ssume a person who was 35 years of age on her alleged onset date.  She
> has a twelfth grade [education], plus some college credits and the past
> relevant work as just indicated.  She's a right-handed individual, suffering
> from a shoulder injury back in the year of 2001, the right shoulder.  She
> derived some pain and discomfort as a result of that, occasional spasm and
> numbness in her right, upper extremity.  She also has a vision deficiency
> but she seems to see adequately.  The file indicates she has 20/40 vision in
> both [eyes], in 9/03.  Her diabetes is somewhat controlled by her
> medications without any significant problems.  Her vision problems are,
> however, caused by her retinopathy either because she was non-compliant
> or otherwise, but the file indicates her seeing ability is 20/40 and she
> indicates she sees all right with glasses but she does have pain and
> discomfort in the neck and shoulder on the right side, occasional headache
> and insomnia associated with her condition, all of which are somewhat
> relieved by her medications without significant side effects but she
> indicates in her testimony, she derives some dizziness as a result of one or
> a combination, would need jobs, Mr. Martin, at this time, that would allow
> her to sit/stand over 20 or 30 minutes if she needed it for a period of time,
> jobs that would allow her to avoid reaching with that right, upper
> extremity and repetitive motion due to her pain and discomfort, jobs not
> requiring keen visual acuity due to her vision, avoid temperature and
> humidity extremes and excessive climbing, balancing and stooping, but
> would be able to do a framework of sedentary and light work activities.
> Would there be jobs out there, in the national economy, in significant
> numbers, such a person can do, in your opinion, as a vocational expert?

Tr. at 68-69.

Martin felt that such an individual would be capable of jobs including inspector,

information clerk, or order clerk.  He testified that nationally there were over 290,000 jobs

---

[6]Gonzalez's testimony at the hearing was generally consistent with her responses to DDS'
Pain Questionnaire and Daily Activities Questionnaire, particularly regarding her daily routine,
limited activities, and her experience of significant pain.  Tr. at 135-48.

available for an inspection line worker at the light exertional level and 38,000 at the sedentary level, including locally 680 and 100 such jobs, respectively. Tr. at 69. Nationally, there were over 54,000 jobs available for an information clerk worker at the sedentary level, including 150 locally; there were over 45,000 jobs available for an order clerk at the sedentary level, including 200 locally. Tr. at 69-70.

On cross-examination, Gonzalez's attorney asked Martin to consider the following:

[H]er physical limitations, like her inability to sit in an eight-hour day for only 25, up to 25 minutes. She can only stand for between . . . 20 to 25 minutes and can . . . only walk between 15 and 20 minutes . . . the interruptions that it's going to cause in her day because she's not going to be able to sit there, at a sit down job, she's not going to be able to stand there at a stand up job because the pain is going to interfere at these intervals. She's going to need to take breaks at these intervals.

Tr. at 72-73. In response, Martin acknowledged that if Gonzalez needed to take extensive breaks she would not be competitive, testifying: "[I]f a person is unable to stay on task – because of needing extensive breaks at interval 15 – or 20 minutes, and that's to leave the work station, okay – for relief or for whatever reason, by medical necessity, then the person really falls below what would be competitive work." Tr. at 73.

### 3. The ALJ's Findings

On November 24, 2004, the ALJ issued the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act, and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's diabetes and myofascial pain are considered "severe" based on the requirements in the Regulations at 20 CFR § 404.1520(c).

4.      These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The claimant has the residual functional capacity to perform a significant range of light work.  The claimant may only occasionally climb ramps, stairs, ladders, ropes and scaffolds and occasionally balance and stoop. She is limited to work that has a sit-stand option and does not require keen visual acuity.  She must avoid reaching with the upper right extremity and repetitive motions.

7.      The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

8.      The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

9.      The claimant has "more than a high school (or high school equivalent) education" (20 CFR § 404.1564).

10.     The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

11.     The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

12.     Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.20 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs include work as inspector, information clerk or order clerk.

13.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision  (20 CFR § 404.1520(g)).

Tr. at 28-29.

18

### III. STANDARD OF REVIEW

**A.      Motion for Summary Judgment**

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil

Procedure 56(c). In determining the appropriateness of summary judgment, the Court must

"review the record taken as a whole . . . draw[ing] all reasonable inferences in favor of the

nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves*

*v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000) (internal citation and quotation

marks omitted). If the Court is able to determine that "there is no genuine issue as to any

material fact" and that the movant is entitled to judgment as a matter of law, summary judgment

is appropriate. *Hill v. City of Scranton,* 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ.

P. 56(c)).

**B.      Review of ALJ Findings**

The Court must uphold the Commissioner's factual decisions if they are supported by

"substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Medical Center v.*

*Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a

preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v.*

*Barnhart,* 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted,

substantial evidence "does not mean a large or significant amount of evidence, but rather such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the

Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh

19

the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001).

The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Thus, the inquiry is not whether the Court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## IV. DISCUSSION

### A.     Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). In order to qualify for DIB, the claimant must establish that he or she was disabled prior to the date he or she was

last insured. *See* 20 C.F.R. § 404.131; *Matullo*, 926 F.2d at 244. A "disability" is defined as the

inability to do any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§

423(d)(1)(A), 1382(c)(a)(3). A claimant is disabled "only if her physical or mental impairment

or impairments are of such severity that she is not only unable to do her previous work but

cannot, considering her age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A);

*Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a

five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel,* 186 F.3d 422, 427-

28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the

sequential process, the Commissioner will not review the claim further. 20 C.F.R. §

404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any

substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i) (mandating finding of non-

disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged

in substantial gainful activity, step two requires the Commissioner to determine whether the

claimant is suffering from a severe impairment or a combination of impairments that is severe.

*See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's

impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step

three, compares the claimant's impairments to a list of impairments (the "listings") that are

21

presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii);

*Plummer,* 186 F.3d at 428. When a claimant's impairment or its equivalent matches an

impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

If a claimant's impairment, either singly or in combination, fails to meet or medically equal any

listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual

functional capacity ("RFC") to perform her past relevant work. *See* 20 C.F.R. §

404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work);

*Plummer,* 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do

despite the limitations caused by her or her impairment(s)." *Fargnoli v. Massanari,* 247 F.3d 34,

40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her

past relevant work." *Plummer,* 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the

Commissioner to determine whether the claimant's impairments preclude her from adjusting to

any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability

when claimant can adjust to other work); *Plummer,* 186 F.3d at 428. At this last step, the burden

is on the Commissioner to show that the claimant is capable of performing other available work

before denying disability benefits. *See Plummer,* 186 F.3d at 428. In other words, the

Commissioner must prove that "there are other jobs existing in significant numbers in the

national economy which the claimant can perform, consistent with her medical impairments, age,

education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must

analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## B.    Gonzalez's Arguments On Appeal

On appeal, Gonzalez essentially presents four arguments for why the ALJ's decision is not supported by substantial evidence: (1) the ALJ did not give sufficient weight to the medical opinions of Gonzalez's treating physicians, particularly Drs. Pando and Gorra, but instead gave undue weight to the medical opinions of the non-examining state agency physicians, Drs. Aldridge and Kataria; (2) the ALJ did not properly consider the combined effects of Gonzalez's impairments; (3) the ALJ improperly determined that Gonzalez was not entirely credible; and (4) the ALJ improperly determined that Gonzalez could perform a range of light work. (D.I. 18, 21)

As explained below, the Court finds that the ALJ did not adequately justify his decision to give almost no weight to the opinions of the treating physicians and nearly controlling weight to the opinions of the non-treating physicians. This matter will be remanded with directions that the Commissioner carefully explain his reasoning with respect to the various medical opinions, consistent with applicable regulations. With respect to each of Gonzalez's remaining arguments, the Court concludes that the Commissioner will have to revisit these issues after properly evaluating the medical opinions.

### 1.    The ALJ Did Not Adequately Justify His Decisions As To The Weight Given To The Opinions Of The Treating And Non-Treating Physicians

Gonzalez contends that the ALJ did not attribute sufficient weight to the medical opinions of her treating physicians. Relatedly, she contends that the ALJ erred by giving significant weight to the medical opinions of two physicians who never examined Gonzalez.

The Commissioner responds that the ALJ assigned appropriate weight to the treating and non-treating physicians' opinions. He argues that the treating physicians' opinions were properly given essentially no weight because they conflicted with the objective medical evidence in the record. By contrast, the non-treating physicians' opinions were given significant weight because they were consistent with the objective medical evidence.

In order to determine the proper weight to be given to a medical opinion, the ALJ is required to weigh all the evidence and resolve any material conflicts. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971). It is not for this Court to reweigh the various medical opinions in the record. *See Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Instead, the Court's review is limited to determining if there is substantial evidence to support the ALJ's weighing of those opinions. *See id.* However, where detailed regulations prescribe the process an ALJ must follow in determining how much weight to give particular evidence, the Court can and should remand for further proceedings if the ALJ failed to follow these procedures. *See generally Jopson v. Astrue*, 517 F.Supp.2d 689, 702 (D. Del. 2007).

The Third Circuit subscribes to the "treating physician doctrine." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993); *see also* 20 C.F.R. § 404.1527(d)(2). "Under that doctrine, a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason*, 994 F.2d at 1067. A treating physician's opinion is therefore accorded "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001); *see also Dass v.*

*Barnhart*, 386 F. Supp.2d 568, 576 (D. Del. 2005) ("A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.") (internal quotations omitted).

Thus, an ALJ may reject a treating physician's opinion "only on the basis of contradictory medical evidence." *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (internal quotation marks omitted). It follows that an ALJ cannot reject a treating physician's opinion "for no reason or for the wrong reason." *Id.* at 317.

Even where there is contradictory medical evidence, however, and an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must still carefully evaluate how much weight to give the treating physician's opinion. A decision not to give a treating physician's opinion controlling weight must not automatically become a decision to give a treating physician's opinion no weight whatsoever. Such is the clear directive of Social Security Regulation ("S.S.R.") 96-2p, 1996 WL 374188, at *4 (July 2, 1996), which provides:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR [§§] 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Regulations further specify the factors an ALJ must consider in deciding how much weight to accord a non-controlling treating physician's opinion. These factors include: treatment relationship, length of treatment relationship, frequency of examination, nature and extent of the

25

treatment relationship, supportability of the opinion afforded by the medical evidence,

consistency of the opinion with the record as a whole, and specialization of the treating

physician. *See* 20 C.F.R. § 404.1527(d)(2)-(6); *see also* 20 C.F.R. § 416.927. These same

regulations "require[] that the adjudicator will always give good reasons in the notice of the

determination or decision for the weight given to a treating source's medical opinion(s) . . . ."

S.S.R. 96-2p, 1996 WL 374188, at *5.

> Therefore . . . [w]hen the determination or decision . . . is not fully favorable, e.g.,
> is a denial . . .the notice of the determination or decision must contain specific
> reasons for the weight given to the treating source's medical opinion, supported by
> the evidence in the case record, and must be sufficiently specific to make clear to
> any subsequent reviewers the weight the adjudicator gave to the treating source's
> medical opinion and the reasons for that weight.

*Id.* Otherwise, a reviewing court cannot determine whether "significant probative evidence was

not credited or if it was simply ignored." *Jopson*, 517 F.Supp.2d at 702 (internal quotation marks

omitted). If a reviewing court is denied the opportunity to make such a determination, "the

claim must be remanded or reversed and all evidence must be addressed." *Id.*

Here, while the ALJ cited to and was clearly aware of the foregoing regulations, he failed

to comply with them. Specifically, the ALJ failed to state how much weight he was giving to

treating opthamologist Dr. Rios' opinion that Gonzalez's "visual prognosis is reserved" and her

sight could deteriorate depending on the progression of her diabetic retinopathy. Tr. at 263. He

also failed to state what, if any, weight he was giving to the opinion of the treating

rheumatologist, Dr. Pando, that Gonzalez's myofascial pain was worsening over time and his

interventions were not helping control her symptoms. Tr. at 221, 259, 312.

The only explanation the ALJ gave with respect to Drs. Rios and Pando was that he rejected their opinions on the ultimate issue of Gonzalez's employability, because this matter is "reserved to the Commissioner." Tr. at 25. However, the ALJ does not refer to any objective medical evidence with which these treating specialists' opinions are inconsistent. Nor are the necessary factors for determining the weight of a non-controlling treating physician's opinion discussed with respect to either Dr. Rios or Dr. Pando.

With respect to treating physician Dr. Gorra, the ALJ stated that he was giving this opinion no "significant weight." Tr. at 24. The ALJ provided reasons for this conclusion. Tr. at 24-25. However, as explained below, these reasons are not supported by substantial evidence. Moreover, the ALJ failed to consider all of the necessary factors before moving from a conclusion that Dr. Gorra's opinion was not entitled to controlling weight to a conclusion that his opinion was not entitled to any significant weight.

The ALJ's discussion of Dr. Gorra's opinion was as follows:

The opinion of a physician is entitled to great weight unless there is persuasive contradictory evidence. A treating physician's medical opinion, on the issue of the nature and severity of an impairment, is entitled to special significance; and, when supported by objective medical evidence and consistent with otherwise substantial evidence of record, entitled to controlling weight (Social Security Ruling 96-2p). However, the opinion of this doctor [Dr. Gorra], appears on a fill-in-the-blank form, with only marginal notes attached to it. Such reports unaccompanied by a thorough written report have been determined by the courts to be weak evidence and their reliability is suspect. Furthermore, the opinion of this doctor, who assessed the claimant with the residual functional capacity of less than sedentary work is not afforded any significant weight as this opinion[] conflicts with the substantial evidence of record, documenting less severe limitations. (Social Security Ruling 96-6p). The doctor did not adequately consider the entire record, including the statements of collateral sources, including the objective findings of other treating physicians. The objective evidence in the record does not support the level of severity that this doctor assigns.

27

> Additionally, the possibility always exists that a person may express an opinion in
> an effort to assist a patient with whom he or she sympathizes for one reason or
> another. Another reality which should be mentioned is that patients can be quite
> insistent and demanding in seeking supportive notes or reports from their care
> providers, who might provide such a note in order to satisfy their patients requests
> and avoid unnecessary tension. While it is difficult to confirm the presence of
> such motives, they are more likely in situations where the opinion in question
> departs substantially from the rest of the evidence of record, as in the current case.
> There is also the distinct possibility that this doctor relied quite heavily on the
> subjective report of symptoms and limitations provided by the claimant, and
> seemed to uncritically accept as true most, if not all, of what the claimant
> reported. Yet, as explained elsewhere in this decision, there exist good reasons
> for questioning the reliability of the claimant's subjective complaints.

Tr. at 24-25.

Each of the reasons given by the ALJ for rejecting Dr. Gorra's opinion is problematic.

First, Dr. Gorra did not submit just a fill-in-the-blank form. Instead, he completed the form sent

to him and attached to it approximately 30 pages of his own and other physicians' treatment

notes and reports, in accordance with the instructions. Tr. at 277-311. Specifically, the fill-in-

the-blank questionnaire simply asked the physician to "answer the following [form] questions

concerning [the claimant's] impairments" and then to "attach all relevant treatment notes,

radiologist reports, laboratory and test results which have not been provided previously to the

Social Security Administration" – all of which Dr. Gorra did. Tr. at 277; *see also* Tr. at 253-54,

264-65 (September 10, 2003 letters from DDS to Drs. Pando and Rios seeking additional

information and advising "[a] narrative report or copies of your records are perfectly

acceptable"). Moreover, the non-treating physicians' opinions to which the ALJ gave

"significant weight" were conveyed on fill-in-the-blank forms – yet they drew no criticism from

the ALJ on this point. Tr. at 25, 242-51, 267-76.

28

Second, it is not clear what "substantial evidence of record" the ALJ is referring to as conflicting with Dr. Gorra's opinion. While it is true that the x-rays, MRIs, and other diagnostic tests document only moderate problems, it is also true that the record contains multiple references to muscle spasms and reduced range of motion. *See, e.g.,* Tr. at 178, 181, 216-17, 221, 228, 277-79, 312; *see also generally Burkett-Wood v. Haines,* 906 A.2d 756, 766 (Del. 2006) (noting that "an MRI, an x-ray, and spasm revealed on palpitation to a physical examination are considered objective medical evidence in this jurisdiction."). Likewise, it is unclear which treating physicians' opinions the ALJ believed Dr. Gorra did not adequately consider.[7] What is clear is that Dr. Gorra's records show that, over the course of his treatment relationship with Gonzalez, he became aware of and obtained copies of the diagnostic tests and opinions of the other treating and consulting physicians. *See* Tr. at 281-84, 296-311.

Finally, it is hard to understand why the ALJ faulted Dr. Gorra for relying too heavily on Gonzalez's subjective complaints about her pain. The ALJ found that Gonzalez suffers from severe conditions that are consistent with the pain she describes feeling. As the Third Circuit has stated: "An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence. While there must be objective evidence of some condition that could reasonably produce pain, there need not be

---

[7]It may be the opinion of Dr. Freedman, the orthopedic specialist whose opinion (that Gonzalez's reflexes and strength were intact and her cervical and lumbar spine were essentially normal) the ALJ describes in his decision. Tr. at 26. If so, however, the ALJ does not explain how he concludes Dr. Gorra did not consider Dr. Freedman's opinion, especially given that it was Dr. Gorra who referred Gonzalez to Dr. Freedman and Dr. Gorra who attached Dr. Freedman's analysis to his (Dr. Gorra's) own submission. Tr. at 281, 301.

objective evidence of the pain itself." *Mason*, 994 F.2d at 1067 (internal citation and quotation marks omitted). There is no objective test Dr. Gorra, or anyone else, could have performed to test the amount of pain Gonzalez was experiencing. Furthermore, the record is devoid of a single instance in which any of the treating physicians questioned whether the necessary objective clinical signs or laboratory findings supported Gonzalez's alleged symptoms; nor did any of the treating physicians express disbelief in Gonzalez's account of her symptoms. In sum, the ALJ's conclusion that "[t]he record fails to provide <u>any objective medical evidence</u> that the claimant's impairments are as severe as her hearing testimony indicates" is not supported by substantial evidence. Tr. at 25-26 (emphasis added).

Moreover, it is not clear from the ALJ's discussion that he considered the following factors in deciding to give Dr. Gorra's opinion "no significant weight": the length of Dr. Gorra's treatment relationship with Gonzalez, the frequency of his examinations, and the nature and extent of the treatment relationship.

With respect to the ALJ's decision to give "significant weight" to the opinions of the non-treating physicians, the ALJ again failed to provide adequate explanation. Social Security regulations "provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual [claimant] become weaker." S.S.R. 96-6p, 1996 WL 374180, at *2 (July 2, 1996).

> For this reason, the opinions of State agency medical . . . consultants and other program physicians . . . can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency

medical . . . consultant or other program physician . . . . The adjudicator must also
consider all other factors that could have a bearing on the weight to which an
opinion is entitled, including any specialization of the State agency medical . . .
consultant.

*Id.*

In particular, the opinions of non-treating physicians must be examined for whether, and

how well, these opinions take account of and explain all of the other evidence in the record,

including the opinions of treating physicians. The regulations stress this point, providing:

[B]ecause nonexamining sources have no examining or treating relationship with
you, the weight we will give their opinions will depend on the degree to which
they provide supporting explanations for their opinions. We will evaluate the
degree to which these opinions consider all of the pertinent evidence in your
claim, including opinions of treating and other examining sources.

20 C.F.R. § 416.927 (emphasis added).

Here, the ALJ "assigned significant weight" to the opinions of the two non-treating

physicians, Drs. Aldridge and Kataria, as to Gonzalez's physical limitations. Tr. at 25.[8] The ALJ

stated that he was doing so "because they [the non-treating physicians' opinions] were based

upon a through [sic] review of the evidence and familiarity with the Social Security Rules and

Regulations and legal standards set forth therein." *Id.* (emphasis added). The ALJ continued by

stating that the opinions of Drs. Aldridge and Kataria were "well-supported by the medical

---

[8]Non-examining state agency physicians are "highly qualified" doctors and "experts in the
evaluation of the medical issues in disability claims under the Social Security Act," and, as such,
their opinions as to a claimant's residual functional capacity merit some weight. *Jopson,* 517
F.Supp.2d at 702 (internal quotation marks omitted); *see also* 20 C.F.R. § 404.1527(f).
Therefore, when the evidence of record (including medical opinions) is fraught with
inconsistency, it is within the ALJ's purview to decide whether a claimant suffers from a
disability after carefully assessing all available evidence. *Jopson*, 517 F.Supp.2d at 702; *see
also* 20 C.F.R. § 404.1527(c)(2).

evidence, including the claimant's medical history and clinical and objective signs and findings as well as detailed treatment notes . . . [and were] not inconsistent with other substantial evidence of record." *Id.* (emphasis added).

However, these non-treating physicians failed to explain why they rejected the opinions of the treating physicians as to Gonzalez's limitations. Indeed, it appears that the non-treating physicians did not even consider the views of the treating physicians. In her December 20, 2002 opinion, Dr. Aldridge answered the question of whether there were treating source statements in the file by responding, "no, no conclusion recorded." Tr. at 248. Yet by this date it appears that DDS had received reports from treating physicians Drs. Choy, Pando, and Maya. *See* Tr. at 215-41; *see also* Tr. at 2 ("List of Exhibits," describing, among other things, medical records of Drs. Choy, Pando, and Maya for periods within the time frame of February 19, 2001 through November 9, 2002). Similarly, in his October 9, 2003 opinion, Dr. Kataria responded to the question, "[I]s a treating or examining source statement(s) regarding the claimant's physical capacities in [the] file[?]," with the answer "no." Tr. at 273. Therefore, it appears that neither non-treating physician considered the opinions of the treating physicians. The record contains no explanation by either Dr. Aldridge or Dr. Kataria as to why their opinion was different than that of Gonzalez's treating physicians. Nowhere does the ALJ address these omissions.[9]

---

[9]Defendant asserts in his brief that Drs. Aldridge and Kataria "reviewed the documentary evidence." (D.I. 20 at 6-7) But he cites merely to the questionnaires each state physician prepared which, as noted in the text, mistakenly state that the record did not contain any treating physicians' reports. While Dr. Kataria listed, in a section of his form entitled "Medical Source Statement(s) To Be Considered," Dr. Pando's May 23, 2003 letter, Tr. at 276, in the same section of her form Dr. Aldridge listed nothing, Tr. at 251. Moreover, as already noted, both non-treating physicians expressly indicated that they believed the record did not contain any reports from treating physicians. *See* Tr. at 248, 273.

For these reasons, there is not substantial evidence to support the ALJ's conclusion that the opinions of the non-treating physicians were "based upon a thorough review of the evidence" and "are not inconsistent with the substantial evidence of record." In these circumstances, the Court concludes that the ALJ did not act in accordance with 20 C.F.R. § 416.927, which requires that the weight accorded to the opinions of non-treating physicians "depend on the degree to which they provide supporting explanations for their opinions" after "consider[ing] all of the pertinent evidence."

Accordingly, on remand, the Commissioner must, consistent with the applicable regulations, carefully explain the weight given to the opinions of each of the treating physicians and the reasons for such weight. Further, if the Commissioner is to give significant weight to the opinion of one or more non-treating physicians, the Commissioner must be assured that such non-treating physicians considered, and explained the value of, the treating physicians' opinions.

### 2.     Consideration Of Gonzalez's Impairments In Combination

The ALJ's RFC assessment must consider the combined effect of all of a claimant's impairments. *See* 20 C.F.R. § 404.1523. Gonzalez argues that the ALJ failed to consider the combination of all of her complaints. (D.I. 18 at 23)

Given the lack of clarity as to the bases for giving so little weight to the treating physicians' opinions and so much weight to those of the non-treating physicians, *see supra*, the Court cannot tell whether the ALJ gave proper consideration to Gonzalez's full set of impairments. In particular, while the ALJ notes Dr. Pando's reference to Gonzalez's apparent

33

affliction with fibromyalgia,[10] Tr. at 22, and despite many references to the condition throughout Gonzalez's medical records,[11] it does not appear that the ALJ considered fibromyalgia in evaluating Gonzalez's RFC.  On remand, the Commissioner must take care to consider all of Gonzalez's impairments, including fibromyalgia, and their combined effect.  *See, e.g.. Rivera v. Barnhart*, 2006 U.S. Dist. LEXIS 27132, at *119 (S.D.N.Y. May 5, 2006) (remanding where ALJ's decision made no reference to fibromyalgia, and ALJ did not consider effects of fibromyalgia in combination with the plaintiff's depression and other physical ailments).

### 3.    Gonzalez's Credibility And Subjective Complaints Of Pain

Gonzalez next challenges the ALJ's conclusion that her subjective complaints regarding her disabling pain were not entirely credible.  (D.I. 18 at 27-31, D.I. 21)  An ALJ's credibility determination is entitled to great deference.  *See Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003).  On the other hand, where objective medical evidence indicates that a claimant has a condition that reasonably could produce the pain the claimant describes, there is no requirement that a claimant produce objective evidence of the pain itself.  *See Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984).  This is particularly true where a claimant suffers from a condition,

---

[10]Fibromyalgia, like myofascial pain syndrome, has been recognized as a "potentially severe impairment[] that may support a claim of disability under the Social Security Act." *Brunson v. Barnhart*, 2002 U.S. Dist. LEXIS 4119, at *49 (E.D.N.Y. Mar. 14, 2002).

[11]For example, as early as April 8, 2002, Dr. Pando, Gonzalez's treating rheumatologist, expressed his concern that Gonzalez was "developing generalized fibromyalgia and the severity of her symptoms will mean that she will not be able to be gainfully employed performing the type of occupation she has held in the past." Tr. at 226.  Dr. Maya also saw Gonzalez for a number of symptoms, including fibromyalgia.  Tr. at 236-38.  Moreover, in his report dated June 17, 2004, Dr. Pando noted to Dr. Gorra that Gonzalez was a "complex case of diabetes mellitus with myofacial pain syndrome that is developing into fibromyalgia and chronic pain syndrome diffusely." Tr. at 302.

34

such as fibromyalgia, for which there are no definitive tests; in such cases "the credibility of a claimant's testimony regarding her symptoms takes on substantially increased significance in the A.L.J.'s evaluation of the evidence." *Rodriguez v. Barnhart*, 2004 U.S. Dist. LEXIS 3947, at *19 (D. Del. Mar. 10, 2004) (internal quotation marks omitted).

In the instant case, the ALJ found that Gonzalez had "underlying medically determinable impairments that could reasonably be expected to result in some of the symptoms as alleged." Tr. at 25. The ALJ found that Gonzalez's subjective complaints of disabling pain were not fully credible because these complaints were contradicted by the objective medical evidence, Gonzalez's demeanor at the hearing, her reported daily activities, and her treatment regimen. Tr. at 25-26.

"In order for an ALJ to reject a claim of disabling pain, he must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990). However, as has already been described in the preceding sections, the Court is not persuaded that there is substantial evidence to support the ALJ's finding that Gonzalez's reports of pain are contradicted by the objective medical evidence. Also, it is not clear whether the ALJ fully considered the effects of Gonzalez's fibromyalgia in evaluating the credibility of her reports of pain. Therefore, on remand, the Commissioner must reassess the credibility of Gonzalez's reports of pain.

### 4. The Conclusion Of The Vocational Expert

Finally, Gonzalez attacks the vocational expert's conclusion that she could perform a range of light work. (D.I. 18 at 32-34) Because this matter is being remanded, and the Commissioner may reach different conclusions as to Gonzalez's impairments and RFC, on

remand the Commissioner may choose to consult a vocational expert.  There is no need at this point to analyze the vocational expert's conclusion in connection with the earlier proceedings.

## V. CONCLUSION

Accordingly, for the reasons set forth in this Memorandum Opinion, Gonzalez's motion for summary judgment will be GRANTED IN PART and DENIED IN PART, the Commissioner's motion for summary judgment will be DENIED, and this matter will be remanded for proceedings consistent with this Memorandum Opinion.  An appropriate Order follows.